No. 118,370

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

REVERSE MORTGAGE SOLUTIONS, INC.,
*Appellee*,

v.

PAULA K. GOLDWYN
AKA PAULA JOAN ENLOW, et al.,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court reviews the district court's approval of the sale of foreclosed real estate at a sheriff's sale only for abuse of discretion. A court abuses its discretion if no reasonable person would agree with its decision or the decision is based on a factual or legal error.

2.

Under K.S.A. 60-2415, the court may decline to confirm a sheriff's sale where the bid is substantially inadequate. In this case, in which there was no deficiency judgment against the borrower and the sheriff's sale bid was 86% of the total judgment, the district court did not abuse its discretion when it concluded the bid was not substantially inadequate.

3.

Under K.S.A. 2017 Supp. 60-261, if an error doesn't affect a party's substantial rights, it's harmless and not grounds for reversal. In this case, although the district court initially granted the motion to confirm the sheriff's sale before the time for other parties

to respond had expired, the court held a hearing later on a motion to reconsider. Because the court's substantive ruling was not an abuse of discretion and it ultimately gave all parties the chance to be heard, the court's initial error in acting too quickly in approving the motion is harmless and not grounds for reversal.

4.

In a typical reverse mortgage, the borrower, age 62 or older, takes out a loan, secured by a mortgage that allows the borrower to take draws against the loan over time. Repayment isn't required during the borrower's lifetime. Because no repayments are made on the loan, the redemption period under K.S.A. 2017 Supp. 60-2414(m) will be three months, not the longer period available when loan default occurs after one-third of the original indebtedness has been repaid.

Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed July 6, 2018. Affirmed.

*Paula K. Goldwyn*, appellant pro se.

*Mark M. Haddad*, and *Beverly M. Weber*, of Martin Leigh PC, of Kansas City, Missouri, for appellee.

Before MCANANY, P.J., LEBEN and SCHROEDER, JJ.

LEBEN, J.: Paula Goldwyn appeals the confirmation of the foreclosure sale of a house she had inherited from her mother. Resolution of some issues she raises may be instructive to Kansas citizens and lawyers because of the context in which this case arises—the use of what's known as a reverse mortgage.

Goldwyn's mother, Bernice Enlow, took out the reverse mortgage for $262,500 in 2007 from Urban Financial Group. Using her home as collateral, the reverse mortgage gave her the ability to take loans—up to $262,500—from Urban Financial Group. And

2

unlike traditional real-estate loans secured by a mortgage, Enlow wouldn't have to make payments to repay the loans she took out. Instead, the loan wouldn't become due and payable until her death (assuming, as was true here, that the home wasn't also the residence of a co-borrower, which would have postponed repayment until both borrowers had died).

As structured, this was essentially the reverse of a traditional real-estate loan and mortgage. In the typical mortgage and loan, the borrower receives the full loan amount at the outset to buy the house. The borrower then pays the loan off in installments over a period of years, with the mortgage released when the loan (plus interest) is fully paid. In the reverse mortgage, the borrower takes the loan proceeds out over time and no payments are made on the loan balance during the borrower's lifetime. Among other things, this lets a retired person live off the equity in their home while continuing to live there. See generally 24 C.F.R. § 206.1 et seq. (2017) (containing regulations for federally insured reverse mortgages, which are available to homeowners age 62 or older); Schieke, *The Advisability of Reverse Mortgage to Pay for Care Needs*, 47 Md. B.J. 26 (May-June 2014) (providing an overview of reverse mortgage programs).

When Enlow died, Goldwyn became the homeowner—but, at the lender's option, all the advances received under the reverse mortgage became due. When Goldwyn didn't pay that balance—through refinancing or otherwise—that led to a foreclosure judgment for $190,446 in favor of Reverse Mortgage Solutions, Inc., which had purchased the mortgage from Urban Financial Group.

Although Goldwyn, now the homeowner, was the defendant in that foreclosure lawsuit, the judgment was taken "in rem" (Latin for "against a thing"), meaning that the lender's sole recourse was against the property. With an in rem judgment, the lender can take the real estate and sell it to pay the judgment, but it can't collect from the debtor's other assets.

3

With that background on how Goldwyn ended up owning this house, which was subject to a reverse mortgage, let's turn next to how the mortgage-foreclosure process works. It came into play here when Goldwyn either chose not to pay off the outstanding loan (perhaps by getting a new loan from another lender) or wasn't able to do so.

In Kansas, mortgage-foreclosure proceedings happen in two steps. First, the mortgage holder must obtain a foreclosure judgment. In that stage, the court must determine whether there has been a default in the mortgage, whether the mortgage holder is entitled to judgment, and the amount and form of the judgment. Second, after getting the foreclosure judgment, the mortgage holder can proceed with a sheriff's sale of the property. Title to the property transfers to a new owner when the court approves the sheriff's sale. The foreclosure judgment and the order approving the sheriff's sale are separately appealable judgments.

Since this sale took place in Riley County, which has a consolidated Riley County Police Department headed by a director, the sheriff's sale was done under that director's authority. The director carries out the statutory duties of a sheriff. See K.S.A. 19-4436. We will refer to the sale in our case as a sheriff's sale since that's the terminology used in most Kansas counties and in the statutory provisions authorizing the sale of foreclosed properties.

Our court has already considered Goldwyn's appeal of the foreclosure judgment. We concluded that it was properly entered by the district court. *Reverse Mortgage Solutions, Inc. v. Goldwyn*, No. 117,449, 2017 WL 6625225, at *14 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* January 29, 2018. Goldwyn now challenges the district court's approval of the sheriff's sale.

4

Two of the issues Goldwyn raises could arise in any mortgage foreclosure but look a bit different in the reverse-mortgage context. First, she complains that the judge shouldn't have approved the sale. Her main complaint seems to be that the district court approved the sale only a short time after Reverse Mortgage Solutions filed its motion seeking approval. Based on the timing, she seems to suggest that the court didn't carefully consider the matter.

We review the district court's approval of a foreclosure sale only for abuse of discretion. *Citifinancial Mortgage Co. v. Clark*, 39 Kan. App. 2d 149, 151, 177 P.3d 986 (2008). A court abuses its discretion if no reasonable person would agree with its decision or the decision is based on a factual or legal error. *In re Marriage of Johnston*, 54 Kan. App. 2d 516, 536, 402 P.3d 570 (2017), *rev. denied* 307 Kan. 987 (2018).

I. *The District Court Did Not Err When It Approved the Sheriff's Sale.*

Goldwyn first argues that the district court shouldn't have approved the sheriff's sale. Although her complaint focuses on the timing of the court's initial action (complaining that it approved the sale the same day Reverse Mortgage Solutions filed a motion seeking approval), we must consider the court's approval within the context of the applicable statutes.

The district court's review of the sale of foreclosed property on court order by a sheriff is governed by K.S.A. 60-2415. It provides that the court "shall confirm" the sale "[i]f the court finds the proceedings regular and in conformity with law and equity." K.S.A. 60-2415(a). The court's authority in equity to decline to approve the sale is spelled out in the next subsection, K.S.A. 60-2415(b): "The court may decline to confirm the sale where the bid is substantially inadequate . . . ." So the first question we must consider is whether the court had discretion to approve the sheriff's sale under these substantive

5

provisions. If so, we must also consider Goldwyn's complaint that the court acted too quickly.

Here, Reverse Mortgage Solutions was the only bidder at the sheriff's sale. It purchased the property for $163,000. That was 86% of the total judgment—and because it was an in rem judgment, Goldwyn was not liable for the 14% deficiency. We find no abuse of discretion in the district court's decision not to find the bid "substantially inadequate."

We've already cited the key legal provisions. The court's authority to decline to confirm the sale is limited to situations in which "the bid is substantially inadequate." K.S.A. 60-2415(b). Even on appeal, Goldwyn hasn't shown that to be true here. In a similar case—one in which there was no deficiency judgment entered against the borrower—our court found a 15% variance between the fair-market value of the property and the price paid at the sheriff's sale didn't make the sheriff's sale bid substantially inadequate. *Farm Credit Bank of Wichita v. Zerr*, 22 Kan. App. 2d 247, 257, 915 P.2d 137 (1996). In our case, Goldwyn cites no evidence of the fair-market value, and the sheriff's-sale bid was 14% less than the amount of the total judgment. But even if the bid was less than the property's fair-market value, that wouldn't have caused harm to Goldwyn.

The price paid at foreclosure for the property can have an impact in two ways on the borrower. First, if there's to be a deficiency judgment, that bid price has an obvious impact—the lower the amount paid for the property, the greater the deficiency. Here, the judgment was in rem, so there wasn't a deficiency judgment to consider at all. Second, the bid price sets the amount the property owner can pay to "redeem" the property, thus reclaiming it. See K.S.A. 2017 Supp. 60-2414(a). So if the bid price was lower than fair-market value, it would have been to Goldwyn's benefit, giving her the opportunity to reclaim the property at the lower price and still have some equity in it.

6

We should note one other provision of the statute on sheriff's sales, even though it doesn't factor into the result here. The statute also provides authority for the court, "as a condition of confirmation [of the sheriff's sale to] require the fair value of the property be credited upon the judgment, interest, taxes and costs." K.S.A. 60-2415(b). Under that provision, if the bid is less than fair-market value but not so low as to be substantially inadequate, the court can make sure that there's no unfairness to the borrower by crediting "fair value" against the judgment. Judicial decisions, including *Olathe Bank v. Mann*, 252 Kan. 351, 845 P.2d 639 (1993), provide factors to consider in determining the fair value under this statute. But this provision doesn't apply here because there's no deficiency judgment at all. See *Kaw Valley Bank v. Ebenezer Evangelical Church*, No. 103,653, 2010 WL 5490744, at *4 (Kan. App. 2010) (unpublished opinion) (holding that the fair-value rule of *Mann* did not apply in case in which no deficiency judgment had been entered).

That this was an in rem judgment—and not one that could be collected against Goldwyn's other assets—is another feature of reverse mortgages. At least for ones that are federally insured, the lender's recovery is limited to what can be obtained through sale of the property: A federal regulation prohibits obtaining a deficiency judgment against the borrower. See 24 C.F.R. § 206.27(b)(8) (2017). Because of that, there may be more leeway to approve the sheriff's sale in a reverse-mortgage case; there's no concern that an underbid will lead to any further liability for the property owner. In any event, we find no abuse of discretion in the court's substantive decision to approve this foreclosure sale.

With the substance of the court's decision resolved, we turn to Goldwyn's complaint that the court acted too quickly. Goldwyn has a point, but not one that changes the outcome.

Reverse Mortgage Solutions filed a motion to confirm the sheriff's sale on May 4, 2017. The district court approved it the same day, then entered an amended order the following day. The court should have waited to allow other parties to respond to the motion before granting it.

Reverse Mortgage Solutions had followed Kansas procedural rules by sending a copy of the motion to all the parties to the case, including Goldwyn. That was required by K.S.A. 2017 Supp. 60-205(a)(1)(D). At that point, other parties—including Goldwyn— had seven days to respond under Kansas Supreme Court Rule 133(b) (2018 Kan. S. Ct. R. 199). During that same time, parties can request a court hearing, though the court can rule without a hearing if it concludes that oral argument wouldn't be of material benefit. Rule 133(c).

In some situations, not present here, a hearing is required on matters related to a sheriff's sale. For example, K.S.A. 60-2415(b) requires a hearing if the court wants to set a minimum bid price for the sheriff's sale. But whether a hearing is to be held or not, the order approving the sheriff's sale is an important, appealable order. Accordingly, all parties should have the opportunity to be heard on the issue. See *Clark*, 39 Kan. App. 2d 149, Syl. ¶ 6. So the district court was wrong in this case to rule before allowing time for the parties to respond to the motion.

Even so, if an error doesn't affect a party's substantial rights, it's harmless and not grounds for reversal. K.S.A. 2017 Supp. 60-261. Goldwyn filed for reconsideration of the court's order approving the sheriff's sale. The court then held a hearing, heard argument of the parties, and reviewed their written submissions. As we've already discussed, granting approval of the sale was well within the district court's discretion.

Goldwyn does complain on appeal that the district court didn't allow her to present evidence at that hearing; she suggests the evidence would have shown that the winning

8

bid at the sheriff's sale wasn't the fair-market-value. But that doesn't mean the bid was substantially inadequate, which is the standard the district court must consider when determining whether to decline approval to the sheriff's sale. On the facts of this case, which involve an in rem judgment, the district court's determination that the bid price was not substantially inadequate wasn't an abuse of discretion, either.

II. *The District Court Did Not Err by Setting a Three-Month Redemption Period.*

Goldwyn next challenges the court's decision that she would have only a three-month redemption period—a time during which the homeowner can reclaim the property by paying off the judgment—rather than the 12-month period sometimes available. This issue is determined under statutory provisions that predate the use of reverse mortgages.

Under K.S.A. 2017 Supp. 60-2414(a), the property owner ordinarily gets a 12-month redemption period. But if "default occurs in the conditions of the mortgage or instrument of the most senior lien foreclosed before 1/3 of the original indebtedness secured by the mortgage or lien has been paid," the redemption period is three months. K.S.A. 2017 Supp. 60-2414(m).

In a traditional mortgage, if foreclosure occurs soon after the loan has been taken out, the redemption period will only be three months because not much of the loan principal has been paid back. Over time, as more of the loan payments go toward principal and as time—and payments—go by, the redemption period will shift to 12 months. That happens when more than one-third of the principal has been paid back; in that case, the borrower has more equity in the house and gets greater legal protection through a longer redemption period.

For a reverse mortgage, if the borrower follows the typical pattern of taking out home equity but not making loan repayments, the redemption period will always be only

9

three months. Using this case as an example, Enlow's first draw against the reverse-mortgage loan was $57,602, taken out in July 2007. Under the statute, that would have been her "original indebtedness." The mortgage amount—$262,500—does not determine the "original indebtedness": a mortgage secures the loan but there's no indebtedness until some money is taken under the loan. While Enlow took additional advances from October 2007 through November 2010, those amounts would represent part of her total indebtedness but not her "original indebtedness." So the original indebtedness in this case was $57,602 and Enlow hadn't paid any of that back. Under K.S.A. 2017 Supp. 60-2414(m), then, since she had paid back less than one-third of the original indebtedness, the redemption period was properly set at three months. See *Julien v. Nationstar Mortgage LLC*, 2017 WL 4005933, at *2 (E.D. Mich. 2017) (unpublished opinion) (noting that because indebtedness in reverse mortgage increases over time, redemption period will always be the shorter option under statute basing redemption period on debt as percentage of "original indebtedness").

The Legislature (or perhaps the Kansas Judicial Council) may want to consider how redemption periods might best work in the reverse-mortgage context. If a borrower died shortly after taking out the reverse mortgage, it's quite possible that the amount of actual debt against the home would be only a small percentage. Yet because no payments would have been made against the original indebtedness, the redemption period would be set at only three months.

Other possibilities might play out differently. In our case, for example, there's at least a possibility that Goldwyn could have gotten a 12-month redemption period had she repaid more than one-third of the $57,602 in original indebtedness.

But we are not called upon to decide what might have happened under other circumstances or whether this statute should be amended to more specifically factor in the equities in reverse-mortgage loans. In our case, nothing had been paid back on the

10

original indebtedness, so the district court properly set the redemption period at three months.

III. *The District Court Did Not Err in Approving Notice of the Sheriff's Sale or in the Form of the Court's Written Orders.*

Goldwyn makes two procedural objections to the process that led up to approval of the sheriff's sale.

The first of these relates to the notice of sale published in the local newspaper. When land is to be sold by court order after foreclosure, a statute requires that public notice of the time and place of the sale be given "once each week for three consecutive weeks prior to the day of sale, by publication." K.S.A. 60-2410(a). That notice must be published in the county where the property is located and the county where the foreclosure judgment was issued. K.S.A. 60-2410(a). Here, since both the house and the judgment came in Riley County, Reverse Mortgage Solutions published the notice in the *Manhattan Mercury* newspaper. Since Manhattan is the county seat of Riley County, that was an appropriate paper—and Reverse Mortgage Solutions published the notice once a week for three consecutive weeks.

Goldwyn argues, though, that the notices were published too quickly after the court ordered they be made. She points out that the district court's order that the sale be held—entered on an order prepared by Reverse Mortgage Solutions' attorney—wasn't filed until 12:43 p.m. on March 6, 2017. The first notice was published in the *Mercury* that same day. And though she recognizes that the *Mercury* is an afternoon newspaper (so that day's paper would have been delivered after the order was entered), she notes that the *Mercury* has to have legal notices two business days before publication. She argues that the court order to sell the property must be issued before notice of the sale is submitted to the newspaper for publication.

11

But there's no requirement like that in the applicable statutes. Notice is required by K.S.A. 60-2410(a), but that statute doesn't require any advance involvement with the court before notice is given. An attorney might well choose to get the court's advance approval of the form of notice—otherwise, if the court were to find it inadequate when later considering whether to approve the sale, the mortgage holder would have to start over on notice and the sale. But that's not a requirement. The mortgage holder merely needs to comply with the statutory requirement that notice of the sale be made once each week for three consecutive weeks in the appropriate newspaper. That was done here.

Goldwyn's second procedural objection is that the district court's written order approving the sheriff's sale said that a hearing had been conducted when, in fact, no in-person hearing was held. She argues that this made the court order fraudulent—and, apparently, ineffective.

We sympathize with Goldwyn's difficulty as a self-represented litigant to understand how the process actually worked here. As she notes, the court's order approving the sheriff's sale began with a statement that a hearing had taken place and that Reverse Mortgage Solutions, the plaintiff, had appeared for it:

> "NOW ON THIS DAY, this case comes on for hearing on the Plaintiff's Motion to Confirm Sheriff's Sale made by the Director on March 28, 2017. The Plaintiff appears by and through its counsel. There are no other appearances."

In fact, as Goldwyn, notes, no one appeared that day in person before the district court.

What happened makes sense to us. But it would not to anyone who lacked experience in the way Kansas courts (and many others) generally handle matters like this.

12

The appearance can cause a perception that the case hasn't been handled fairly. Before we discuss those perceptions, though, let's first deal with what really happened.

When a party files for court approval of a sheriff's sale, the party (through its attorney) also presents a proposed order for the court's consideration. If the court finds that approval is proper, the court can sign and enter that order as submitted, modify the order and then sign it, or prepare its own order. The proposed order here said that the plaintiff had appeared through counsel—something that simply shows, at least to us, that the plaintiff had "appeared" by presenting the proposed order.

At one time, in many (perhaps most) Kansas courts, orders like this were submitted in person on designated motion days. The court would hold a hearing on pending motions, and many attorneys would appear to be heard. In those hearings, the attorneys presented their proposed orders to the court for consideration in person. Over time, the practice has shifted so that most motions now are presented to the court for consideration without a hearing.

What hasn't changed, though, are the form orders many attorneys use. They still often recite that the "case came on for hearing" and that the party presenting the proposed order "appeared." Better practice—and plain English—would suggest that these form orders should be revised so that a layperson like Ms. Goldwyn wouldn't think something nefarious had been afoot. Here, however, we are confident that nothing of that sort took place. Even so, we do not fault her for wondering, especially since the district court ruled on the motion to approve the sheriff's sale without first allowing other parties time to respond.

In sum, we review the district court's order approving a sheriff's sale only for an abuse of discretion. Although the court did err in ruling too quickly on the motion, that

error did not harm Goldwyn's substantial rights, and we find no abuse of discretion in the court's judgment.

We therefore affirm the district court's judgment.